**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DOTTIE LINK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:09CV 1180 CEJ(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Dottie Link for Disability Insurance Benefits under Title II of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 16). Defendant has filed a Brief in Support of the Answer. (Doc. No. 24). Plaintiff has filed a Reply. (Doc. No. 25).

## Procedural History

On October 24, 2006, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on July 1, 2005. (Tr. 89-94).[1] This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

---

[1]Plaintiff's prior application for Title II benefits was denied at the initial level on January 10, 2006. (Tr. 97-98).

opinion by an Administrative Law Judge (ALJ), dated March 25, 2008. (Tr. 58-63, 10-21). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on May 29, 2009. (Tr. 6, 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on February 20, 2008. (Tr. 26). Plaintiff was present and was represented by counsel. (Id.). Vocational Expert Delores Gonzalez was also present. (Id.).

The ALJ examined plaintiff, who testified that she was thirty-eight years of age and had completed the twelfth grade. (Id.). Plaintiff stated that she had earned about one years worth of college credits through work training and attending classes at Southwest Baptist University. (Tr. 27).

Plaintiff testified that, in the past, she had worked part-time as a bartender. (Id.). Plaintiff stated that she had worked as a machinist, which involved programming milling and drilling machines. (Id.).

Plaintiff testified that she had also worked at a facility for the handicapped for many years as both an aide and a team leader. (Tr. 28). Plaintiff stated that as an aide, she primarily lifted clients. (Id.). Plaintiff testified that as a team leader, she supervised three to four clients, which involved helping the clients adapt to everyday living. (Tr. 28-29).

Plaintiff stated that she worked as a corrections officer for a few years in Pacific, Missouri. (Tr. 29).

Plaintiff testified that she also worked as a property manager for a business owned by her husband.  (Id.).  Plaintiff stated that, as a property manager, she collected rent, evicted people, and performed maintenance.  (Id.).  Plaintiff explained that the maintenance work she performed included plumbing, electrical, and  work on floors, walls, windows, roofs, ceilings, and doors.  (Id.).  Plaintiff stated that she last worked for her husband's business in June or July of 2005.  (Id.).  Plaintiff testified that she stopped working at this time because she injured her left foot and underwent surgery.  (Tr. 30).

Plaintiff stated that she began having problems with her back in the summer of 2006, about one year afer she injured her foot.  (Id.).  Plaintiff testified that she began experiencing sciatic nerve pain in her lower back and going down her right leg.  (Id.).  Plaintiff stated that she suspected her foot injury may have contributed to this pain because she started walking on the outside of her foot after her foot surgery.  (Id.).

Plaintiff testified that she underwent an MRI of her back, after which she was treated with injections.  (Id.).  Plaintiff stated that the second time she underwent injections it helped for about two weeks, but the third time it only helped for a few days.  (Id.).

Plaintiff testified that she underwent a surgical procedure on her back in March of 2007 in which part of the disc that was putting pressure on the sciatic nerve was shaved off with a laser.  (Tr. 31).  Plaintiff stated that this procedure was not effective.  (Id.).  Plaintiff testified that she underwent micro disc surgery in the fall of 2007.  (Id.).

Plaintiff stated that she has not worked since July of 2005.  (Tr. 32).  Plaintiff testified that the property management business is owned by her godfather and that her husband works for the business.  (Id.).

Plaintiff stated that, at the time of the hearing, she was experiencing pain in her lower back from the sciatic nerve, which was going down the back of her right leg and causing tingling in her foot and toes. (Id.). Plaintiff testified that she had recently undergone an EMG and nerve conduction study, which revealed weakness in her right leg but good muscle control in her left leg. (Tr. 33).

Plaintiff stated that, due to her back pain, she occasionally requires help from her husband to get dressed. (Id.). Plaintiff testified that she is unable to bend and twist a lot and performing housework is difficult. (Id.). Plaintiff stated that she must take frequent breaks when performing housework. (Id.). Plaintiff testified that she frequently sits in a recliner on a heating pad. (Id.).

Plaintiff stated that she also has problems with her foot when she stands or walks for long periods. (Id.). Plaintiff testified that when she touches the incision site she experiences a shooting pain up her calf. (Id.). Plaintiff stated that she underwent therapy for her foot and wore a cast for six to seven months. (Tr. 34). Plaintiff testified that in September of 2006, her doctor removed the implant that was placed in her foot. (Id.).

Plaintiff stated that she filed a previous claim for disability, which was denied without a hearing before an ALJ. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that her most serious problem is her back. (Id.). Plaintiff stated that she would rate her back pain as a seven on a scale of zero to ten. (Id.). Plaintiff's attorney noted that plaintiff had been up and down during the hearing and in the waiting room prior to the hearing. (Tr. 35). Plaintiff explained that she becomes uncomfortable when sitting and she did not want to squirm in her seat. (Id.). Plaintiff testified that she experiences sharp pain in her lower back that goes down her buttocks. (Id.). Plaintiff

stated that she favors her left foot because it takes the pressure off of her back. (Id.). Plaintiff testified that she does not wear jeans because the waistband puts pressure on her lower back, which causes pain. (Id.).

Plaintiff testified that she has been treating with Dr. Maynard and his staff since 2000. (Id.). Plaintiff stated that she sees Dr. Maynard or his staff at least once every three months. (Tr. 36).

Plaintiff testified that Dr. Maynard's office and a pain clinic in St. Louis keep her medications up to date. (Id.). Plaintiff stated that she goes to the pain clinic approximately every two weeks. (Id.). Plaintiff testified that the physicians at the pain clinic monitor her progress and administer injections. (Id.). Plaintiff indicated that she had recently changed from a pain clinic in Rolla to a clinic in St. Louis. (Tr. 37). Plaintiff testified that her surgeon, Dr. Yoon, recommended the St. Louis pain clinic because he did not feel that the Rolla pain clinic was helping her. (Id.).

Plaintiff stated that Dr. Yoon is not able to obtain another MRI to determine if an additional surgery is warranted until the scar tissue heals. (Id.). Plaintiff testified that Dr. Yoon cut down a disc but did not remove it. (Tr. 38).

Plaintiff stated that she has arthritis in her knees and that she has undergone six arthroscopic knee surgeries. (Id.). Plaintiff testified that she has had three surgeries on her left knee and three surgeries on her right knee, and that they all involved shaving cartilage and repairing tendons. (Id.). Plaintiff stated that the first knee surgery took place when she was in high school. (Id.).

Plaintiff testified that she crushed the middle, ring, and little fingers of her right hand when

she was eight years old and that she experiences difficulty gripping as a result.  (Tr. 39).  Plaintiff

indicated that she was right-hand dominant.  (Id.).  Plaintiff acknowledged that she worked many

jobs, including a position at a machine shop, despite this impairment.  (Id.).  Plaintiff testified that

she has arthritis, which causes difficulty gripping a pencil or pen after she writes a paragraph or

longer.  (Id.).

Plaintiff testified that an implant was placed in her left foot due to a tendency of patients to

roll their foot inward after surgery.  (Tr. 40).  Plaintiff stated that the implant was removed

because it was causing her to walk on the outside of her foot.  (Id.).  Plaintiff testified that the

bone near the ball of her big toe was broken, which causes shooting pains in her big toe after

about twenty minutes of standing.  (Tr. 41).  Plaintiff rated her foot pain as a four or five.  (Id.).

Plaintiff testified that it is difficult to climb stairs because she is unable to bear weight on her right

leg.  (Id.).  Plaintiff stated that it is also difficult to climb ladders due to her right foot pain.  (Id.).

Plaintiff testified that the medications she takes cause side effects.  (Tr. 42).  Plaintiff

stated that she takes Percocet[2] and Cymbalta,[3] which both cause constipation and fatigue.  (Id.).

Plaintiff stated that she takes between four to eight tablets of Percocet a day.  (Id.).  Plaintiff

testified that the amount of pills she takes varies depending on her level of activity.  (Id.).  Plaintiff

explained that she takes more pills if she is physically active than she takes if she is just sitting at

home.  (Id.).  Plaintiff testified that driving, sitting, and getting in and out of her vehicle cause

---

[2]Percocet is indicated for the relief of moderate to moderately severe pain.  See
Physicians' Desk Reference (PDR), 1223 (59th Ed. 2005).

[3]Cymbalta is indicated for the treatment of major depressive disorder.  See PDR at 3431.

increased pain. (Tr. 43).

Plaintiff stated that she tries to go to bed at 10:00 or 11:00 p.m., but she is usually up until 2:00 or 3:00 a.m. because she is unable to get comfortable due to her back and leg pain. (Id.). Plaintiff testified that she is only able to sleep on an air mattress, lying on her side with a body pillow between her knees. (Id.). Plaintiff stated that she usually gets up for the day around 10:00 a.m. (Id.). Plaintiff testified that she usually naps during the day because her medication makes her "groggy." (Tr. 44). Plaintiff stated that she naps in a recliner. (Id.).

Plaintiff testified that she is able to stand at the kitchen counter to wash dishes for about ten minutes before she has to sit down. (Id.). Plaintiff stated that she is able to walk in the grocery store for about ten minutes before she has to either sit down or lean against something due to back and foot pain. (Tr. 45). Plaintiff testified that she was only able to sit down in the chair during the hearing for about five minutes. (Id.). Plaintiff stated that it is difficult for her to reach with her right arm because she experiences a shooting pain on her right side that goes down her right leg. (Id.). Plaintiff testified that she is able to squat and stoop but it is difficult for her to get back up due to pain. (Tr. 46). Plaintiff stated that she is only able to lift and carry about six pounds across the room due to her lower back pain. (Id.).

The ALJ next questioned plaintiff regarding an October 29, 2007 report of Dr. Yoon, in which he indicated that plaintiff was no longer working except for her own business. (Id.). Plaintiff testified that she was in the home repair business but she was no longer working. (Id.). Plaintiff explained that Dr. Yoon asked her what she was doing before her problems started and she responded that she was working at her own business. (Tr. 47). Plaintiff testified that she was not working at her own business at the time of the hearing. (Id.). Plaintiff stated that her husband

was an employee at her relative's business. (Id.). Plaintiff testified that she had no earnings for tax year 2007. (Id.).

The vocational expert, Ms. Gonzalez, then questioned plaintiff, who testified that her bartender job was in the early 1990s. (Tr. 48). Plaintiff stated that when she worked as property manager for her own business, she used saws, drills, and basic construction tools to do plumbing, electrical, and maintenance. (Id.). Plaintiff testified that she performed this type of maintenance work most of the day at this position. (Id.).

The ALJ then posed the following hypothetical to the vocational expert: can lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk for six hours out of an eight-hour day; sit for six hours out of an eight-hour day; occasionally climb stairs and ramps; never climb ropes, ladders and scaffolds; occasionally stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold and vibration and the hazards of unprotected heights; and no repetitive pushing and pulling with her left leg. (Tr. 49).

Plaintiff's attorney stated that he was objecting to the hypothetical question because it appeared to be based on the opinion of a non-physician. (Id.). The ALJ overruled the objection, noting that the hypothetical was not based on the opinion of a non-physician and that plaintiff's attorney would have the opportunity to ask his own hypothetical questions. (Id.).

Ms. Gonzalez testified that plaintiff would be unable to perform her past jobs with the limitations contained in the first hypothetical. (Tr. 50). Ms. Gonzalez stated that plaintiff would be able to perform other light work, such as the position of usher (101,530 positions nationally, 2,820 positions in Missouri); and production assembler (288,470 positions nationally, 4,840 positions in Missouri). (Tr. 51).

The ALJ next asked Ms. Gonzalez to assume the same limitations as the first hypothetical with the following exceptions: lifting ten pounds occasionally and less than ten pounds frequently; standing and walking two hours out of eight; and sitting six hours. (Id.). Ms. Gonzalez testified that plaintiff would be unable to perform her past relevant work but would be able to perform other sedentary positions. (Id.). Ms. Gonzalez stated that plaintiff could perform the position of surveillance system monitor (80,680 positions nationally, 1,240 positions in Missouri); and table worker (483,020 positions nationally, 8,790 positions in Missouri). (Tr. 51-52).

Plaintiff's attorney then examined Ms. Gonzalez. Plaintiff's attorney asked Ms. Gonzalez to assume a hypothetical claimant with the following limitations: must frequently adjust her position in sitting and standing so that she is unable to sit more than five minutes, stand more than ten minutes, and walk more than ten minutes; must rest in a recliner for forty-five minutes; would require longer bathroom breaks due to constipation; unable to lift more than six pounds; and would be able to squat but would have difficulty getting up. (Tr. 52-53). Ms. Gonzalez testified that such an individual would have difficulty working. (Tr. 53).

Plaintiff's attorney then asked Ms. Gonzalez to refer to Dr. Maynard's letter dated July 2007. (Id.). Ms. Gonzalez testified that, as a vocational expert reviewing medical records, she would rely on such a letter in determining placement or training of a vocational candidate. (Id.).

The ALJ noted that the letter plaintiff's attorney referred to was signed by a nurse practitioner. (Id.). Plaintiff's attorney indicated that it was signed by the doctor and the nurse practitioner. (Id.). Plaintiff's attorney stated that his office may have prepared the letter for the doctor's signature. (Tr. 54). Plaintiff's attorney indicated that he would make sure that the

correct letter signed by the doctor was in the record.  (Id.).

## B.    Relevant Medical Records

The record reveals that plaintiff underwent an MRI of the lumbar spine[4] on April 28, 2005, due to complaints of lower back pain.  (Tr. 249).  The MRI revealed a mild L4-5 disc bulge and mid annular tear  without evidence of neural impingement and a mild L5-S1 disc bulge with borderline mass effect on the right anterior S1 nerve root in the lateral recess.  (Id.).

Plaintiff saw Scott H. Clarke, M.D. at St. John's Regional Health Center in Springfield, Missouri, on May 12, 2005.  (Tr. 251).  Plaintiff complained of low back pain radiating to the right lower extremity that had been present since April of 2005, when she helped to lift someone who had fallen through the floor.  (Id.).  Upon examination, plaintiff's straight leg raise was positive on the right and negative on the left, her gait was antalgic[5] on the right, and she had right lumbar paraspinous tenderness and spasm.  (Tr. 252).  Plaintiff had normal strength of the bilateral lower extremities, and normal range of motion of the lumbar spine with the exception of forward flexion, which exacerbated plaintiff's right lower extremity pain.  (Id.).  Dr. Clarke's assessment was right S1 radiculopathy.[6] (Id.).  Dr. Clarke administered an epidural steroid injection at L5-S1.  (Id.).

---

[4]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[5]Characterized by reduced response to painful stimuli.  See Stedman's Medical Dictionary, 71 (27th Ed. 2000).

[6]Disorder of the spinal nerve roots.  Stedman's at 1622.

On May 24, 2005, plaintiff presented to Dr. Clarke for another epidural steroid injection. (Tr. 256). Plaintiff reported that her pain was completely relieved for two days after the last epidural steroid injection but her pain returned somewhat. (Id.). On May 31, 2005, plaintiff reported marked relief after her last injection. (Tr. 257). Dr. Clarke administered a third epidural steroid injection and prescribed physical therapy. (Id.).

Plaintiff presented to Vicki Adamick, RN/CNP at St. John's Clinic on August 10, 2005, with complaints of left foot pain. (Tr. 205). Plaintiff underwent x-rays of the left foot. (Id.). Ms. Adamick's assessment was possible posterior tibial tendon rupture/tear, and tibial fracture. (Id.). She ordered an MRI, placed plaintiff in a Cam Walker boot, and advised plaintiff that she would most likely require surgical repair. (Id.). Plaintiff continued to see Ms. Adamick for treatment of her back pain, foot pain, and other complaints. (Tr. 229-31, 288-95).

Plaintiff saw Mark A. Schumaker, DPM, on August 15, 2005, with complaints of left foot pain. (Tr. 204). Dr. Schumaker's assessment was posterior tibial tendon repair left. (Id.).

Dr. Schumaker performed a posterior tibial tendon repair of plaintiff's left foot with a subtalar joint implant placement on August 19, 2005. (Tr. 218-20).

Plaintiff saw Dr. Schumaker on August 26, 2005, at which time plaintiff reported that one of her animals stepped on her incision. (Tr. 201). Dr. Schumaker placed a cast on plaintiff's foot to protect it from further incidents and advised plaintiff to keep her leg elevated. (Id.). On September 7, 2005, plaintiff reported significant reduction in pain and swelling. (Tr. 198). Dr. Schumaker permitted plaintiff to go back into a Cam Walker but she was to remain non weight-bearing with crutch assist. (Id.).

On September 28, 2005, plaintiff reported that a friend who weighed approximately 280

pounds had stepped on her left foot twice. (Tr. 194). Plaintiff complained of pain and edema. (Id.).
Dr. Schumaker indicated that he was not sure whether the repair was still intact. (Id.). Dr.
Schumaker advised plaintiff that she should remain absolutely non weight-bearing with crutch assist.
(Id.).

On October 5, 2005, plaintiff reported that she occasionally goes without her Cam Walker
and does not sleep with it in place. (Tr. 193). Dr. Schumaker advised plaintiff to wear her Cam
Walker at all times. (Id.). On October 12, 2005, plaintiff reported that her incision was significantly
improved and healed. (Tr. 192). On October 26, 2005, plaintiff reported that she had been very
active and had been walking on her foot in the Cam Walker. (Tr. 190). Plaintiff related that she had
ripped out kitchen, bathroom and living room floors and installed several water heaters in her rental
properties. (Id.). Dr. Schumaker advised plaintiff that she was pushing herself too hard too fast and
that the demolition work she was doing would cause increased pain and delayed healing. (Id.). He
also advised plaintiff that she needed to begin cutting back on her narcotic use and noted that chronic
Percocet use is unacceptable. (Id.). On November 30, 2005, Dr. Schumaker recommended that, due
to the tears displayed on the MRI, plaintiff should become non-weight-bearing. (Tr. 187). Dr.
Schumaker stated that, due to plaintiff's continued activity level despite medical recommendations
to maintain protected weight bearing and minimize the amount of ambulation she was performing,
plaintiff had progressed to the point where she had tearing present within the posterior tibial tendon
again. (Id.). On December 7, 2005, plaintiff reported that she had cut her cast off because the cast
was "driving her nuts." (Tr. 186). Dr. Schumaker advised plaintiff that she should continue with
casting to provide non-weight-bearing to the area. (Id.). He also recommended that plaintiff obtain
a second opinion. (Id.).

On April 19, 2006, plaintiff presented to Dr. Schumaker, reporting that she felt something pop when she was bowling one week prior. (Tr. 184). Plaintiff indicated that she had been doing well prior to the injury and that she was performing all activities of daily living and was very active. (Id.). Dr. Schumaker's impression was injury to left foot with no fracture or dislocation noted on x-ray. (Id.). Dr. Schumaker noted that he questioned plaintiff's level of pain due to the fact that plaintiff reported significant pain and swelling with bowling yet she indicated that she wished to resume these activities. (Id.). Dr. Schumaker also indicated that plaintiff's story changed throughout the appointment. (Id.). Dr. Schumaker stated that there was not a lot he could offer plaintiff and noted that plaintiff had not followed-up since December 2005 and that she did not listen to his treatment plan. (Id.).

Plaintiff presented to the emergency room at Salem Memorial District Hospital on June 1, 2006, with complaints of right hip muscle pain radiating down her leg. (Tr. 222-226). Plaintiff underwent a CT scan of her lumbar spine, which revealed a mild central posterior bulge/bulging disc at L4-L5 and slight compression of thecal sac at this level; right paracentral mild disc herniation at L5-S1; borderline spinal canal narrowing in the upper lumbar spine; and minor degenerative changes involving the facet joints, more marked in the lower lumbar spine and lumbosacral junction. (Tr. 227).

Plaintiff underwent an MRI of the lumbar spine on June 13, 2006, which revealed a moderate L5-S1 disc bulge and more prominent right subarticular protruding disc resulting in mild displacement of the right S1 nerve root; and a mild L4-5 disc bulge and mid annular tear without significant central canal or foraminal stenosis.[7] (Tr. 261).

---

[7]Narrowing of the vertebral foramen. See Stedman's at 1833.

Plaintiff presented to Glenn Kunkel, M.D. and Kevin Snyders, CRNA-FNPC at Central Missouri Pain Management for a consultation on August 22, 2006. (Tr. 235-37). Plaintiff complained of increased low back pain radiating into the right hip and right leg. (Tr. 235). Plaintiff rated her pain as an eight to nine on a scale of zero to ten and indicated that her pain was worse with any activity, sitting, driving, flexion and extension. (Id.). Plaintiff reported that physical therapy and exercises at home provided minimal relief. (Id.). Plaintiff indicated that Percocet and Vicodin[8] offered no relief of significance, although the Percocet helped take the edge off. (Id.). Upon examination, Mr. Snyders noted edema in the extremities, decreased range of motion in the knees, positive straight leg raise on the right, tenderness over the sacroiliac joint, and minimal spasm of the paralumbar muscle. (Tr. 236-37). Plaintiff's neurologic examination was normal. (Tr. 236). Mr. Snyder's assessment was lumbar radiculopathy of the right leg and lumbar spondylosis[9] without myelopathy.[10] (Tr. 237). He indicated that plaintiff may benefit from a steroid injection at L4-5 based on the bulge with annular tear and a facet injection for the lumbar spondylosis. (Id.). He noted that plaintiff would be treated by Dr. Maynard. (Id.).

Plaintiff underwent a nerve root block to the right side of L4-5 on September 5, 2006. (Tr. 238). Plaintiff underwent a lumbar facet injection at L3-4, L4-5, and L5-S1 on September 18, 2006. (Tr. 245).

---

[8]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 527.

[9]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's at 1813.

[10]Disorder of the spinal cord. Stedman's at 1270.

On October 10, 2006, Dr. Kunkel performed a lumbar discography[11] at three levels, including L5-S1, L4-5, and L3-4. (Tr. 242). Dr. Kunkel stated that he believed that plaintiff probably had discogenic[12] pain. (Tr. 243). He indicated that plaintiff exhibited signs of a concordant pain response at the L5-S1 and L4-5 level and that the L5-S1 level also gave a tremendous amount of leg pain on the right side. (Id.). Dr. Kunkel stated that plaintiff was scheduled to see Dr. Harbach on October 18, 2006 for consideration of fusion surgery. (Tr. 244).

Plaintiff presented to Kraig Holtorf, PA, and Todd Harbach, M.D. on October 18, 2006, with complaints of low back pain but not much right leg pain. (Tr. 267). Upon physical examination, plaintiff was able to raise up on her heels and toes without any pain and was able to forward bend and extend with discomfort. (Id.). The assessment was concordant pain at L4-5 and L5-S1, negative at L3-4; low back pain; and right leg pain. (Id.). Plaintiff indicated that she would like to remain conservative with treatment and that she would contact Dr. Harbach if she had a desire to have surgery. (Id.).

Plaintiff presented to the emergency room at Salem Memorial District Hospital on December 8, 2006, with complaints of low back pain after tearing down a fireplace the previous day. (Tr. 270). The impression of the examining physician was acute myofascial[13] strain and low back pain. (Tr. 273). Plaintiff underwent a CT scan of the lumbar spine, which revealed a uniform central posterior bulge/bulging disc at L4-L5; right paracentral mild disc herniation at L5-S1 and degenerative changes

---

[11]Radiographic demonstration of intervertebral disc by injection of contrast media into the nucleus pulposus. Stedman's at 550.

[12]Pain originating in or from an intervertebral disc. See Stedman's at 550.

[13]Of or relating to the fascia surrounding and separating muscle tissue. Stedman's at 1272.

at this level; borderline spinal canal narrowing in the upper lumbar spine; mild degenerative changes involving facet joints and spur formation at various levels; and generalized loss of bone density and a density of indeterminate nature in the right iliac bone. (Tr. 275).

On December 11, 2006, Dr. Kunkel performed radiofrequency lesioning[14] of the respective dorsal root ganglia[15] at L4 and L5. (Tr. 280). Dr. Kunkel indicated that he would perform radiofrequency lesioning of her facet nerves in a few weeks. (Id.). Dr. Kunkel noted that plaintiff had not had any formalized physical therapy and recommended that plaintiff start physical therapy and try a TENs[16] unit. (Tr. 281). He also indicated that Dr. Harbach did not wish to pursue surgery. (Id.).

On January 22, 2007, Dr. Kunkel performed radiofrequency lesioning of plaintiff's facet nerves. (Tr. 279). He prescribed Oxycontin.[17] (Id.).

On February 26, 2007, Dr. Kunkel performed a bilateral sacroiliac joint block. (Tr. 298). Dr. Kunkel noted that plaintiff had yet to schedule any formalized physical therapy or a TENS unit. (Id.).

---

[14]Radiofrequency ablation of nerves is a procedure that may be used to reduce certain kinds of chronic pain by preventing transmission of pain signals. It is a procedure by which a portion of nerve tissue is heated to cause an interruption in pain signals and reduce pain in that area. This procedure is sometimes called radiofrequency lesioning. WebMD, http://www.webmd.com/cancer/tc/radiofrequency-lesioning-for-chronic-pain (last visited January 26, 2011).

[15]A ganglion is a group of nerve cell bodies in the central or peripheral nervous system. The dorsal root ganglia are the ganglia of the posterior (dorsal) root of each spinal segmental nerve. See Stedman's at 785-86.

[16]Abbreviation for transcutaneous electrical nerve stimulation, a method of reducing pain by passage of an electric current. Stedman's at 1838.

[17]Oxycontin is indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. See PDR at 2819.

Plaintiff reported that the radiofrequency lesioning of her dorsal root ganglia and facet nerves did not help. (Id.). Plaintiff indicated that the Oxycontin caused severe constipation. (Tr. 299). Dr. Kunkel prescribed a Duragesic patch.[18] (Id.).

On March 20, 2007, Dr. Kunkel performed a right-sided percutaneous discectomy[19] at L4-5 and L5-S1. (Tr. 300). Plaintiff complained of pain down both legs but mostly right hip and right lower back pain. (Tr. 301). Dr. Kunkel indicated that plaintiff attended one visit of physical therapy with a TENS unit but reported that it did not help. (Id.). Plaintiff reported that the Duragesic patches did not particularly help and also caused constipation. (Id.).

In an undated letter, Dr. Maynard and Ms. Adamick indicate that they had been treating plaintiff since approximately 2000 and had recently examined plaintiff on July 3, 2007. (Tr. 303). They list plaintiff's diagnoses as: advanced degenerative joint disease[20] of the lumbar spine, being treated by orthopedic specialist and pain management clinic; and arthritis of the right mid-foot being treated by podiatrist. (Id.). They noted that plaintiff was being treated with Percocet as needed by her pain management clinic. (Id.). They state that plaintiff's "lower back pain with right leg pain is the underlying medical reasons she is unable to work and these medical conditions are on a

---

[18]Duragesic patch is a transdermal system providing continuous systemic delivery of fentanyl, a potent opioid analgesic. It is indicated in the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be managed by lesser means. See PDR at 1731.

[19]Excision of an intervertebral disc through the skin, using a small incision. See Stedman's at 550, 1456.

[20]Degenerative joint disease, or osteoarthritis, is characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

continuous and daily basis." (Id.).

Plaintiff underwent a lumbar MRI on September 26, 2007, which revealed degenerative changes at L4-5 and L5-S1 with central disc protrusion at L4-5 and disc bulging at L5-S1. (Tr. 304).

Plaintiff presented to Matthew A. Rieth, M.D. on October 4, 2007. (Tr. 306-07). Plaintiff complained of right lower extremity pain and numbness in the seated position for about a month. (Tr. 306). Dr. Rieth noted that plaintiff's biggest problem was cramping in her calves that had been occurring for over a month, since she had been walking on her toes due to back pain she experiences when flat-footed. (Id.). Upon physical examination, the straight leg raise in the seated position produced symptoms that moved to the posterior thigh and posterior knee; in the supine position plaintiff could barely take the right leg off the bed on her own due to proximal posterior area pain with some radiation into the leg; straight leg raise in the supine position appeared to be positive with pain proximally and referred into the leg. (Id.). Plaintiff underwent an electromyogram[21] of the lower extremities, which was normal. (Id.). Dr. Rieth's assessment was no electromyographic evidence for active right or left lumbosacral radiculopathy on needle testing; no electrodiagnostic evidence for peripheral neuropathy[22] of the right lower extremity on nerve testing; degenerative disc changes with protrusion at the L4-5 level; and mechanical back pain. (Tr. 307). Dr. Rieth recommended that plaintiff continue her current treatments. (Id.). He indicated to plaintiff that physical therapy may be painful but that was an indication that spasm was a big part of the problem. (Id.). Dr. Rieth noted that modalities followed by gentle stretch with muscle relaxants and intermittent trigger point injections would be useful. (Id.).

_____

[21]An electromyogram or EMG is a graphic representation of the electric currents associated with muscular action. Stedman's at 622.

[22]Disorder of the nervous system. See Stedman's at 1313.

Plaintiff presented to Peter Yoon, M.D., at West County Neurological Surgery, Inc. on October 29, 2007, for a second opinion regarding surgery. (Tr. 323). Plaintiff complained of lower back pain mostly on the right side, with radiation down the leg. (Id.). Plaintiff reported that she was no longer working except for her own business. (Id.). Upon examination, Dr. Yoon found that plaintiff was in moderate distress. (Id.). Plaintiff had a relatively flat affect and was in chronic pain. (Id.). Dr. Yoon noted weakness and positive straight leg raising on the right side. (Id.). Dr. Yoon's impression was L5 radiculopathy. (Id.). Dr. Yoon found that before fusion is considered, it would be worthwhile to consider a foraminotomy,[23] perhaps via removal of the facet on the right side. (Id.). Plaintiff indicated that she would like to proceed with the foraminotomy. (Id.).

Plaintiff underwent a right L5-S1 partial facetectomy[24] microdissection on November 6, 2007. (Tr. 314). Plaintiff's post-operative diagnosis was lumbar spondylosis with foraminal stenosis, L5-S1 on the right. (Id.).

Plaintiff saw Dr. Yoon on December 20, 2007, six weeks following surgery. (Tr. 310). Plaintiff continued to report pain, although her main concern was the back pain and not so much the leg pain. (Id.). Plaintiff's leg pain was intermittent, which implied that the leg pain was somewhat better following surgery. (Id.). Plaintiff's back pain was still debilitating. (Id.). Dr. Yoon recommended pain management procedures before considering further intervention. (Id.). Plaintiff was scheduled to follow-up with a pain management specialist at Western Anesthesia. (Id.).

---

[23]Surgical enlargement of the intervertebral foramen. Stedman's at 759.

[24]Excision of a facet. Stedman's at 691.

# The ALJ's Determination

The ALJ made the following findings:

1.     The claimant met the insured status requirements on July 1, 2005. The claimant's date last insured is December 31, 2007.

2.     The record does not confirm substantial gainful activity after the alleged onset date. (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.     The claimant has degenerative disc disease of the lumbar spine and a history of a left foot injury. These are severe in combination.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds the claimant can frequently lift and carry less than ten pounds and occasionally lift and carry ten pounds. The claimant can stand and/or walk two hours in an eight hour work day. The claimant can sit six hours in an eight hour work day. The claimant cannot climb ropes, ladders and scaffolds. The claimant can occasionally climb stairs and ramps as well as occasionally stoop, crouch, kneel and crawl. The claimant cannot perform repetitive pushing and pulling with her left leg. The claimant must avoid concentrated exposure to extreme cold, vibration and hazards of heights.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant is a younger individual.

8.     The claimant has more than a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2005 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-21).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on October 24, 2006, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 21).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of

the evidence in the record and apply a balancing test to evidence which is contrary." <u>Burress</u> <u>v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." <u>Id.</u>

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. <u>See</u> <u>Ingram v.</u> <u>Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. <u>See</u> 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." <u>Id.</u> Age, education and work experience of a claimant are not considered in making the "severity" determination. <u>See</u> <u>id.</u>

If the impairment is severe, the next issue is whether the impairment is equivalent to

one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.    Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining that plaintiff's impairments were not medically equal to the listing for disorders of the musculoskeletal system. Plaintiff next contends that the ALJ erred by failing to evaluate the combined effects of all of

plaintiff's impairments.  Plaintiff argues that the ALJ failed to properly weigh the opinions of plaintiff's treating physicians.  Plaintiff also contends that the residual functional capacity formulated by the ALJ is not supported by the record.  Plaintiff finally argues that the hypothetical question posed to the vocational expert was deficient .  The undersigned will discuss plaintiff's claims in turn.

**1.      Listing 1.04**

Plaintiff first argues that the ALJ erred in determining that plaintiff's impairments were not medically equal to Listing 1.04, the listing for disorders of the musculoskeletal system.  Defendant argues that the ALJ properly determined that plaintiff did not meet a listed impairment.

The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  To meet a listing, an impairment must meet all of the listing's specified criteria.  Id.  An impairment that manifests only some of these criteria, no matter how severely, does not qualify.  Id. (quoting Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion.  Pepper ex rel Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

Listing 1.04 provides as follows:

*Disorders of the Spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.  Evidence of nerve root compression characterized by neuro-

anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, App. 1.

In this case, the ALJ properly considered Listing 1.04 and found that plaintiff's back impairment did not meet or medically equal the listing.  (Tr. 12).  Plaintiff fails to explain how her impairment met Listing 1. 04.  Although the evidence reveals that plaintiff suffered from a severe back impairment, plaintiff has not met her burden of establishing that her impairment met the specific criteria of Listing 1.04.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**2.**      **Opinion of Treating Physicians**

Plaintiff argues that the ALJ erred in weighing the opinion of plaintiff's treating physicians. Specifically, plaintiff contends that the ALJ failed to assign "great weight" to the letter signed by both Vicki Adamick, RN, FNP, and Gregory Maynard, D.O.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir.

2001) (quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." <u>Rhodes v. Apfel</u>, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting <u>Metz v. Halala</u>, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." <u>Id.</u> at 1013 (quoting <u>Bentley</u>, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" <u>Id.</u> (quoting <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997)).

At issue is an undated form letter, apparently prepared by plaintiff's attorney, signed by Ms. Adamick and Dr. Maynard. This form contains the pre-printed statement that plaintiff's "lower back pain with right leg pain is the underlying medical reasons she is unable to work and these medical conditions are on a continuous and daily basis." (Tr. 303). In blank spaces on the form, Ms. Adamick and Dr. Maynard listed plaintiff's diagnoses as advanced degenerative joint disease of the lumbar spine, being treated by orthopedic specialist and pain management clinic; and arthritis of the right mid-foot, being treated by podiatrist. (<u>Id.</u>). The only other information provided by Ms. Adamick and Dr. Maynard was plaintiff's medications, which is listed as "Percocet p.r.n.-per Pain Management Clinic." (<u>Id.</u>).

The ALJ discussed this form at length in his opinion. The ALJ first pointed out that it appeared obvious that the section regarding plaintiff's ability to work was written not by Dr.

Maynard but was provided in the pre-printed form by plaintiff's attorney. (Tr. 17). The ALJ next noted that, although the form letter included Dr. Maynard's signature, it first contains the signature of a nurse practitioner, Ms. Adamick. (Id.). He noted that the opinion of a nurse practitioner is not that of an acceptable medical source with respect to the diagnosis and limitations. (Id.). The ALJ stated that it was very significant that the medical record does not include documentation of ongoing treatment by Dr. Maynard, which might support the findings within the letter. (Id.). The ALJ stated that this fact undermines the weight accorded to the opinion of Dr. Maynard in the pre-printed letter provided by plaintiff's attorney. (Id.). Finally, the ALJ noted that the finding of inability to work concerns an issue reserved to the Commissioner. (Id.). The ALJ therefore indicated that he was assigning "little weight" to the "letter" procured by plaintiff's attorney. (Id.).

The undersigned finds that the ALJ articulated sufficient reasons for assigning little weight to the letter signed by Ms. Adamick and Dr. Maynard. Although plaintiff argues that the opinion should be given controlling weight because it was the opinion of plaintiff's treating physician, the ALJ's analysis was consistent with the Commissioner's regulations, which provide that a treating physician's opinion is given controlling weight if, and only if, it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). First, with regard to Dr. Maynard, there is no indication in the record that Dr. Maynard provided treatment for plaintiff's orthopedic impairments. Rather, the record reveals that Dr. Maynard referred plaintiff to specialists. As such, the letter is not supported by Dr. Maynard's own treatment notes. Further, as the ALJ pointed out, the fact that plaintiff's attorney prepared the form for Dr. Maynard's signature undermines the weight accorded to the opinion. Finally, the conclusion that plaintiff cannot work "involves an issue

reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Brown v. Astrue, 611 F.3d 941, 952 (8th Cir. 2010).

With respect to Ms. Adamick, the record reveals that Ms. Adamick regularly treated plaintiff for her back pain and other general complaints. (Tr. 205, 229-31, 288-95). Ms. Adamick, a nurse practitioner, is considered an "other source," whose opinion may be used to show the severity of an impairment. See 20 C.F.R. § 416.913(a). The ALJ was entitled to assign little weight to Ms. Adamick's letter for the reasons discussed above with respect to Dr. Maynard.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**3.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff also contends that the ALJ failed to evaluate the combined effects of all of plaintiff's impairments in assessing her residual functional capacity.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical

evidence, although the residual functional capacity finding must be supported by *some* medical

evidence.  See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional

capacity:

> After careful consideration of the entire record, the undersigned finds the claimant can
> frequently lift and carry less than ten pounds and occasionally lift and carry ten pounds.
> The claimant can stand and/or walk two hours in an eight hour work day.  The claimant
> can sit six hours in an eight hour work day.  The claimant cannot climb ropes, ladders and
> scaffolds.  The claimant can occasionally climb stairs and ramps as well as occasionally
> stoop, crouch, kneel and crawl.  The claimant cannot perform repetitive pushing and
> pulling with her left leg.  The claimant must avoid concentrated exposure to extreme cold,
> vibration and hazards of heights.

(Tr. 12).

The undersigned finds that the ALJ's residual functional capacity determination is not

supported by substantial evidence.  As support for his determination, the ALJ cited plaintiff's

activities and the objective medical record, and stated that plaintiff failed her burden to establish a

more restrictive residual functional capacity.  (Tr. 19).  Although a claimant's residual functional

capacity is determined at step four of the sequential evaluation process, where the burden of proof

rests on the claimant , the ALJ bears the primary responsibility for determining a claimant's RFC.

Krogmeier, 294 F.3d at 1023.  As noted, an RFC is based on all relevant evidence, but it "remains a

medical question" and "'some medical evidence must support the determination of the claimant's

[RFC].'"  Id. (quoting Hutsell, 259 F.3d at 711).  See also Lauer, 245 F.3d at 704.

In this case, the ALJ pointed to no medical opinion supporting his determination.  The

only examining physician who expressed an opinion regarding plaintiff's ability to work was Dr.

Maynard.  As discussed above, the ALJ provided sufficient reasons for assigning little weight to

that opinion.  The fact that no other treating physician imposed any functional limitations on

- 29 -

plaintiff "cannot be used as substantial evidence that [Plaintiff] is not disabled" because none were asked to express an opinion on the matter. See id. at 943-44 (citing Lauer, 245 F.3d at 705).

Although the ALJ stated that the objective medical findings support his determination, the objective medical record reveals that plaintiff suffers from degenerative joint disease of the lumbar spine, with bulging disc at L5-S1, L5 radiculopathy, and foraminal narrowing, (Tr. 261, 304, 323). Plaintiff has taken narcotic pain medication and has undergone physical therapy, epidural steroid injections, radiofrequency lesioning, and surgery, with little reported improvement. (Tr. 301). On December 20, 2007, the most recent treatment note in the record, plaintiff's surgeon Dr. Yoon indicates that plaintiff's back pain is "still debilitating" following surgery. (Tr. 310). The objective medical record does not support the ALJ"s determination that plaintiff is capable of performing sedentary work.

There is no opinion from any physician, other than Dr. Maynard, regarding plaintiff's ability to function in the workplace with her combination of impairments. As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform a range of sedentary work. The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace, formulate a new residual functional capacity for plaintiff based on the

medical evidence in the record, and then to continue with the next steps of the sequential evaluation process.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __7th__ day of February, 2011.


_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE